UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ANTHONY MCCRADY, | Case No. 18-cv-00931-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF No. 16, 17 |

## INTRODUCTION

Plaintiff Anthony McCrady seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for benefits under Title XVII of the Social Security Act.[1] Mr. McCrady moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge jurisdiction.[4] The court grants Mr. McCrady's motion for summary judgment and denies the

---

[1] Compl. – ECF No. 1 at 1; Motion – ECF No. 16 at 4. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Compl. – ECF No. 1; Motion – ECF No. 16.

[3] Cross-Motion – ECF No. 17.

[4] Consent Forms – ECF Nos. 8, 10.

government's cross-motion and remands the case for further proceedings consistent with this order.

## STATEMENT

### 1. Procedural History

Mr. McCrady, then aged 48, filed his application for supplemental security income on June 25, 2013, alleging Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, and insomnia.[5] His alleged onset date is June 25, 2013.[6] The application was initially denied on March 5, 2014, and denied on reconsideration on August 15, 2014.[7] Mr. McCrady then asked for a hearing before an Administrative Law Judge ("ALJ").[8]

On June 20, 2016, the ALJ held a hearing and heard testimony from Mr. McCrady (represented by attorney Amy Orgain).[9] A Vocational Expert ("VE") was present via teleconference but did not testify.[10] The ALJ issued an unfavorable ruling on October 19, 2016.[11] On October 28, Mr. McCrady's attorney sent a letter to the ALJ requesting that he re-open the hearing decision.[12] The ALJ denied the request.[13] Mr. McCrady filed a request for review with the Appeals Council, which denied the request on December 19, 2017.[14]

---

[5] AR 24, 51.

[6] AR 24.

[7] AR 84, 94.

[8] AR 131.

[9] AR 38.

[10] AR 38; *see* AR 38–50.

[11] AR 38, 21.

[12] AR 18.

[13] AR 16.

[14] AR 187, 1.

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Alameda County Behavioral Health Care Services — Treating

Mr. McCrady received treatment from February 2012 to November 2012 while incarcerated in Santa Rita Jail in Alameda County.[15] Mr. McCrady was prescribed Zoloft (for depression), Trazodone (for insomnia), and Depakote (an antipsychotic).[16] At an appointment on June 5, 2012, Mr. McCrady inquired about receiving a Social Security referral through the jail clinic.[17] When the clinician asked Mr. McCrady about his history, Mr. McCrady said that he was "gainfully employed until 2004, when he came out of prison, moved to Sacramento and worked, and moved to Texas and back to CA, when he became homeless."[18] He "reported working warehouse jobs loading and unloading, shipping and receiving and sales."[19] His stated reason for unemployment was "increased drug use (crack cocaine)."[20]

At a visit on July 9, 2012, Mr. McCrady reported that his medications were helping him and that he felt that he was "not so quick to anger any longer."[21] He discussed medication and treatment options post-release.[22]

Mr. McCrady had another appointment with Behavioral Health Care Services on October 10, 2012 after he was arrested for violating his parole.[23] Neal Edwards, M.D., reported that Mr. McCrady's "speech [was] normal rate and tone" and that he was "cooperative."[24] Mr. McCrady's

---

[15] AR 387–451 (the records are presented in reverse-chronological order; some of the records are indecipherable (*see*, e.g., AR 400–01)).

[16] AR 402.

[17] AR 405.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] AR 403.

[22] *Id.*

[23] AR 397.

[24] *Id.*

"mood [was] euthymic" and his "thought [was] coherent."[25] On October 11, 2012, Mr. McCrady underwent a mental-status exam in the Santa Rita Jail clinic, where he presented with a depressed mood and reported "frequently cutting his wrists [and that he was] unable to sleep well, [and was] feeling hopeless."[26] He denied having suicidal ideation.[27] On November 6, 2012, the clinician noted that Mr. McCrady "seemed very depressed, anxious and irritable" and "[c]omplained that his psych meds [were] not working."[28] Mr. McCrady told the clinician that he recently found out that his mother was diagnosed with lung cancer, and he was worried that he wouldn't be able to see her when he was released.[29]

### 2.1.2    Sausal Creek Outpatient Clinic — Treating

Mr. McCrady was examined at the Sausal Creek Outpatient Stabilization clinic in Oakland, California on January 29, 2013.[30] He presented with "depr[essed] mood, anx[iety], insomnia, nightmares, and delicate cutting."[31] The physician who examined Mr. McCrady prescribed Zoloft (for depression), Trazodone (for insomnia), Depakote (an antipsychotic), and Visatril (for anxiety).[32]

Mr. McCrady reported that he was attending a Narcotics Anonymous program and that he would like to reconnect with his adult children and "become independent."[33]

### 2.1.3    Parole Outpatient Clinic — Treating

The medical records indicate that Mr. McCrady had multiple scheduled appointments at the Parole Outpatient Clinic ("POC") but attended only one (on July 9, 2013) with Licensed Clinical

---

[25] *Id.*
[26] AR 396.
[27] *Id.*
[28] AR 390.
[29] *Id.*
[30] AR 507.
[31] AR 508.
[32] AR 507.
[33] AR 511.

Social Worker ("LCSW") Donna Pedroza.[34] Ms. Pedroza reported that Mr. McCrady was "polite overall," that "his speech was generally clear," and he was "quite talkative."[35] Mr. McCrady was under the influence during the meeting, so while they discussed some of Mr. McCrady's history, Ms. Pedroza was "unable to complete [the] initial interview."[36] She referred Mr. McCrady to a POC psychiatrist and encouraged him to attend all of his POC appointments.[37]

### 2.1.4    LifeLong Medical Care Clinic — Treating

Mr. McCrady began receiving treatment at LifeLong Medical Care clinic in downtown Oakland in September 2015.[38] At his initial visit, Physician's Assistant ("PA") Gretchen Duran examined him.[39] He presented with symptoms of anxiety, depression, and insomnia.[40] PA Duran prescribed Depakote (an antipsychotic), Trazodone (for insomnia), and Zoloft (for depression).[41]

From October 26, 2015 to May 24, 2016, Mr. McCrady attended five appointments with Nurse Practitioner Skyler Loeb at LifeLong Medical Care.[42] Ms. Loeb's treatment notes reflect that Mr. McCrady was steadily medicated and that by March 14, 2016, he was still having trauma related-nightmares but was "getting things done," "sleeping well," and not having panic attacks.[43] In May 2016, Mr. McCrady reported that "he had trouble refilling medications and decided to just stop them," which led to "a resurgence of anhedonia and depressed mood."[44] The notes indicated that Mr. McCrady was drinking alcohol throughout treatment.[45]

---

[34] *See* AR 326–30; AR 326.

[35] AR 326.

[36] *Id.*

[37] *Id.*

[38] AR 531.

[39] AR 531–33.

[40] AR 531.

[41] AR 533.

[42] AR 535–49.

[43] AR 544.

[44] AR 547.

[45] *See e.g.* AR 535, 538, 541.

Ms. Loeb completed a Medical Impairment Questionnaire regarding Mr. McCrady on June 3, 2016.[46] She reported that she had seen Mr. McCrady "every two months since 10/26/15."[47] Mr. McCrady "presents with passive suicidal ideation; frequent trauma re-experiencing [and was] at times borderline catatonic."[48] In response to the question whether the "patient's impairments [would] remain as severe in the absence of substance use," Ms. Loeb answered, "Yes, [Mr. McCrady] has demonstrated symptom severity in the absence of substances."[49]

The form statement presented Ms. Loeb with a list of twenty abilities and asked her to rate Mr. McCrady on each.[50] Her findings were as follows:

| | None | Mild[51] | Moderate[52] | Marked[53] | Extreme[54] |
|---|---|---|---|---|---|
| **Work-Related Mental Abilities:** | | | | | |
| Understand, remember and carry out simple instructions | | | X | | |
| Make simple work-related decisions | | | X | | |
| Maintain regular attendance and be punctual within customary, usually strict tolerances | | | | X | |
| Complete a normal workday and workweek without interruptions from psychologically-based symptoms | | | | | X |
| Perform at a consistent pace without an unreasonable number and length of rest periods. | | | | | X |
| Sustain an ordinary routine without special supervision | | | | X | |
| Accept instructions and respond appropriately to criticism from supervisors | | | | | X |

---

[46] AR 527.

[47] Id.

[48] Id.

[49] Id.

[50] AR 529–30.

[51] "None or Mild indicates that in spite of the patient's impairments, the patient retains the ability to perform the activity on a sustained basis in a normal, full-time (40 hour workweek) work setting." AR 529.

[52] "Moderate indicates the patient is occasionally (up to 1/3 of the workday) unable to perform the activity in a normal work setting." Id.

[53] "Marked indicates the patient is frequently (up to 2/3 of the workday) unable to perform the activity on a sustained basis in a normal, full-time work setting." Id.

[54] "Extreme means the patient retains no useful ability to perform the activity and cannot perform this activity at all in a regular work setting." Id.

| | | | | | |
|---|---|---|---|---|---|
| Work with or near others without being unduly distracted or distracting them | | | | X | |
| Interact appropriately with coworkers | | | X | | |
| Interact appropriately with the general public | | | X | | |
| Respond appropriately to changes in a routine work setting | | | | X | |
| Deal with normal work stress | | | | | X |
| Adhere to basic standards of neatness and cleanliness | | | X | | |

Ms. Loeb characterized Mr. McCrady's "deficiencies of concentration, persistence or pace" as "Extreme" and checked a box indicating that his impairments would interfere with his concentration or pace of work 50% of the day.[55] She wrote that Mr. McCrady "would likely decompensate in the setting of [full-time] work" and that he "requires mental health rehabilitation services in an intensive way that would interfere with [full-time] work."[56]

### 2.1.5 Marc Tietelbaum, Licensed Marriage and Family Therapist ("MFT") — Treating

Mr. McCrady had two psychotherapy sessions with Mr. Tietelbaum, one on January 22, 2014, and a second on March 12, 2014.[57] In his notes, Mr. Tietelbaum wrote that Mr. McCrady was "fairly comfortable . . . from the start and was quite articulate and engaging" at the first visit.[58] Mr. McCrady described "his struggles with depression and anger" and said that he has PTSD from years spent in prison cells.[59] Mr. McCrady said that "the reason he has often preferred homelessness is because he did not feel confined."[60] Mr. McCrady told Mr. Teitelbaum that his mother — who abused him when he was young — died recently and that he was "full of grief" and couldn't seem to "get over her death."[61] Mr. McCrady described being a "basketball star" in high school and college but left St. Mary's College after he had problems with a new coach."[62]

---

[55] AR 530.

[56] Id.

[57] AR 497–98 (records are in reverse-chronological order).

[58] AR 498.

[59] Id.

[60] Id.

[61] Id.

[62] Id.

Mr. McCrady described feeling depressed and hopeless and having "angry outbursts."[63] Mr. McCrady said he has "tremendous regret about his life," specifically around drug use and his time spent in prison.[64] He said that he found it hard to function but that he was proud that he had "been clean from crack cocaine the past year."[65]

In his notes from a subsequent session, Mr. Teitelbaum wrote that Mr. McCrady "appeared more depressed and despondent than in previous sessions."[66] Mr. McCrady said that he stopped taking medication for depression and insomnia a year before, and Mr. Teitelbaum suggested that he get his prescriptions refilled and resume taking them.[67] He told Mr. Teitelbaum that he "typically drinks a case of malt liquor a day" but "doesn't consider himself an alcoholic because he doesn't get the DT's[68] when he doesn't drink."[69] Mr. McCrady talked about a suicide attempt "a few years ago" but said he did not have a current plan to harm himself or others.[70] Mr. Teitelbaum noted that Mr. McCrady cut himself somethings and had "lots of cuts."[71]

Mr. McCrady also discussed feeling "upset and despondent over having his [disability] claim denied" and that he "feels incapable of working and holding a job."[72]

### 2.1.6    Dr. Laura Catlin, Psy.D. — Examining

Dr. Laura Catlin performed a psychological-disability evaluation report after examining Mr. McCrady on October 22, 2013.[73] Dr. Catlin reported that Mr. McCrady approached her in "a guarded yet cooperative manner" and that he was "responsive" and "appeared to be a credible

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] AR 497.

[67] *Id.*

[68] "DT's" is a common way of referring to delirium tremens, a severe form of alcohol withdrawal.

[69] AR 497.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] AR 332.

historian."[74] At the time Dr. Catlin examined him, Mr. McCrady had not taken his medication for two weeks.[75] Dr. Catlin performed a clinical interview and three tests on Mr. McCrady: the Weechsler Abbreviated Scale of Intelligence (WASI), the Beck Depression Inventory (BDI), and the Brief Symptom Inventory (BSI).[76] She also provided a medical-source statement based on her evaluation and review of Mr. McCrady's records.[77]

In the clinical interview, Dr. Catlin wrote that Mr. McCrady's "affect was frustrated and irritated" but said that he was "polite and well-spoken during the interview."[78] His mood was "depressed and agitated."[79] Mr. McCrady described alternating between feeling very agitated and very depressed.[80] He reported that he witnessed extreme violence in prison and was sodomized while incarcerated and that he had "persistent and unwanted" memories and nightmares about his time in prison.[81] He described having "great difficulty performing all activities of daily living" due to his long-term homelessness.[82] He reported that after being released from prison, he attempted suicide by cutting his wrists.[83] He also reported having an imaginary friend named "Maynard" that he "talks to and has communicated with since he was a child."[84] Dr. Catlin reported Mr. McCrady's history of crack cocaine and alcohol abuse and noted that he continued to drink

---

[74] *Id.*

[75] AR 334.

[76] AR 332.

[77] AR 337.

[78] AR 335, 334.

[79] AR 334.

[80] AR 332.

[81] AR 332–33.

[82] AR 333.

[83] *Id.*

[84] AR 335.

alcohol "on occasion."[85] Dr. Catlin concluded from the interview that Mr. McCrady's insight and judgment were "impaired" and that his thought "consisted primarily of depressive thoughts."[86]

Dr. Catlin administered the WASI, which "measures general intelligence."[87] Dr. Catlin reported that Mr. McCrady's score on this test placed him within the "borderline range of intellectual functioning."[88] Mr. McCrady "scored a 27 on the BDI indicating symptoms of moderate depression."[89] Mr. McCrady's score on the BSI placed him in the 80th percentile, which means "he is experiencing high levels of psychological distress."[90]

In her medical-source statement, Dr. Catlin reported that Mr. McCrady was "experiencing symptoms of depression and PTSD" as a result of severe traumatization in prison.[91] She determined that Mr. McCrady's ability to perform in the workplace was "severely impaired" as a result of these symptoms.[92] She determined that restrictions on Mr. McCrady's activities of everyday life were "within the extreme range," that he "has marked difficulties in maintaining social functioning," and that his "deficiencies of concentration, persistence or pace are in the extreme range."[93]

### 2.1.7    Dr. Kyle Van Gaasbeek, Psy.D. — Examining

Dr. Van Gaasbeek performed a comprehensive psychological examination of Mr. McCrady on February 3, 2014.[94] Dr. Van Gaasbeek found Mr. McCrady to be a reliable historian.[95] Mr. McCrady reported that he "has been depressed all of his life," he has "a lack of motivation, low

---

[85] AR 334.

[86] AR 335.

[87] AR 336.

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] AR 337.

[92] *Id.*

[93] AR 338.

[94] AR 492.

[95] *Id.*

self esteem [sic] and fear of violence," and he refuses to take his medications "because they make him sluggish."[96] He told Dr. Van Gaasbeek that he had been to jail and prison "over 20 times," he "used to have a problem with crack cocaine" but has been clean for a year, he drinks alcohol daily, and he had been to rehab 4–5 times.[97] He reported that he spends his days riding his bicycle, recycling, and sitting in the park.[98]

Dr. Van Gaasbeek described Mr. McCrady as appearing older than his age and being "somewhat malodorous."[99] For some of the interview, Mr. McCrady was "alert and oriented" but at other times he was "restless," made poor eye contact, and "was slumped over in his chair."[100] Mr. McCrady's concentration, persistence, and pace were "a bit slow," and his concentration was "adequate."[101] Mr. McCrady "denied any current suicidal thoughts."[102] Dr. Van Gaasbeek assessed Mr. McCrady's immediate memory as good ("[i]mmediate recall of three objects was 3/3"), his recent memory as "poor," and his past memory as "fair."[103] He rated Mr. McCrady's fund of knowledge and information as "fair," his ability to perform calculations as "good," his concentration as "fair," his abstract thinking as "concrete," and his judgment and insight as "adequate."[104]

Based on this examination, Dr. Van Gaasbeek diagnosed Mr. McCrady with major depressive disorder, moderate cocaine dependence in remission, and alcohol dependence.[105] He also noted "antisocial personality traits."[106] He assigned Mr. McCrady a Global Assessment of Functionality

---

[96] *Id.*

[97] AR 493.

[98] *Id.*

[99] *Id.*

[100] AR 493–94.

[101] AR 493.

[102] AR 494.

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

("GAF")[107] score of 55.[108] He wrote, "The claimant's depression is treatable. He has recently begun receiving treatment for this condition. His depression is complicated by his ongoing alcoholism. This is an obstacle towards his recovery and improvement."[109]

Dr. Van Gaasbeek provided a medical-source statement.[110] He found that the following of Mr. McCrady's work-related abilities were unimpaired: "[Mr. McCrady's] ability to perform simple and repetitive tasks;" his ability to perform "detailed and complex tasks;" "his ability to accept instructions from supervisors;" "his ability to perform work activities on a consistent basis without special or additional instructions," and his "ability to maintain regular attendance in the workplace."[111] He determined that Mr. McCrady's abilities "to interact with coworkers and the public," "to complete a normal workday, without interruptions from a psychiatric condition," and "to deal with the usual stress encountered in the workplace" were "mild[ly] to moderately impaired."[112]

### 2.1.8 Dionne Childs, MS and Lesleigh Franklin, Ph.D. — Examining

Ms. Childs — under the supervision of Dr. Franklin — examined Mr. McCrady on April 14, 2016.[113] She issued a "Confidential Psychological Evaluation" report on May 13, 2016.[114] Ms. Childs conducted a clinical interview and also administered the Beck Anxiety Inventory ("BAI"), the BDI, the Miller Forensic Assessment of Symptoms ("M-FAST"), the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), and the WASI.[115] Ms. Childs observed

---

[107] A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014). A GAF score of 55 indicates "moderate difficulty in occupational functioning." *Craig v. Colvin*, 659 Fed.Appx 381, 382 (9th Cir. 2016).

[108] AR 495.

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] AR 518.

[114] *Id.*

[115] *Id.*

that Mr. McCrady's "attention was impaired," "he worked at a rate that was slow as compared with peers," and he exhibited severe "delayed and immediate memory problems."[116] His affect was "relatively flat . . . [and] [h]is mood was depressed."[117]

In the clinical interview, Mr. McCrady described past physical and mental abuse by his mother, and he discussed getting into drugs, being in prison, and his struggles with depression.[118] He told Ms. Childs that sometimes he had violent outbursts and sudden bouts of crying.[119] He related a past suicide attempt.[120] He said that he had terrible nightmares about prison that sometimes "cause urination" and that his behavior and "feelings of comfort with people" changed after he was incarcerated.[121] He reported that he had "full conversations with himself" and that "no psychotropic medicines have really worked for him."[122]

Mr. McCrady told Ms. Childs that he lived in a motor home with roommates and went "to his father's house to shower sometimes."[123] Regarding his work history, Mr. McCrady stated that he did "manual labor, warehouse work, and sales on one occasion" and that at the time of the interview he, "recycle[d] to earn money."[124]

On the WASI, Mr. McCrady scored a 79, which "place[d] him in the 8th percentile, as compared with adults in his age group" and showed that "Mr. McCrady's intellectual functioning [fell] within the Well Below Average Range."[125] He scored a 55 on the RBANS, placing him "in the 0.1 percentile and in the Extremely Low range."[126] Mr. McCrady's results on the M-FAST test

---

[116] AR 519.

[117] AR 520.

[118] *Id.*

[119] AR 519.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] AR 518.

[125] AR 520.

[126] AR 521.

"suggest[ed] that he was not prone to overstate the severity of his symptoms."[127] His scores on the BAI "indicate that he is experiencing severe anxiety," and "[s]cores for the BDI indicate that he is experiencing severe depression.[128]

Based on her tests and observations, Ms. Childs concluded that Mr. McCrady "display[ed] an impairment of general mental abilities."[129] She offered eight possible diagnoses, noting that "the results of the evaluation are limited in scope by the records available, the time of the evaluation, and the client's self-report."[130] The diagnoses were "Unspecified Depressive Disorder, Posttraumatic [sic] Stress Disorder, Unspecified Psychotic Disorder, Unknown Substance Use Disorder, Borderline Intellectual Functioning, Relational Problems, Occupational Problems, and Low Income."[131]

### 2.1.9 Michael Hammonds, Ph.D., Beverley Morgan, M.D. and Norman Zukowski, PhD. — Non-Examining

Two Disability-Determination Explanations ("DDE") were issued during the pendency of Mr. McCrady's disability claim.[132] In the first DDE at the initial-claim level, Dr. Hammonds found that Mr. McCrady was not disabled.[133] Mr. McCrady's "historical symptoms [did] not indicate marked functional limitations."[134] Based on his review of the records, Dr. Hammonds opined that Mr. McCrady's condition "result[ed] in some limitations in [his] ability to perform work related activities" but was "not severe enough to keep [him] from working."[135] He said that Mr. McCrady would be "limited to unskilled work" and provided three examples of occupations with a

---

[127] AR 522.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] AR 51–65; AR 66–83.

[133] AR 64.

[134] AR 60.

[135] AR 64.

United States District Court
Northern District of California

significant number of jobs that exist in the national economy that Mr. McCrady could perform: textile checker; folder; and dowel inspector.[136]

At the reconsideration level, Dr. Morgan analyzed Mr. McCrady's history and records and determined that Mr. McCrady did not have a medical disability that "would cause significant limitations in the last 12 months" and that Mr. McCrady's "physical impairments [were] non-severe."[137] Dr. Zukowski found that Mr. McCrady was not credible, noting that he "allege[d] treatment, but none is documented," and that he was "noncompliant with [his] medication regime."[138] He agreed with Dr. Hammond's assessment that Mr. McCrady's "[h]istorical symptoms [did] not indicate marked functional limitations." In June, he found him not disabled.[139]

### 2.2   Other Opinion Records

#### 2.2.1   Robert McCrady — Brother

Robert McCrady, the plaintiff's brother, submitted a Third-Party Function Report on October 16, 2013.[140] Robert McCrady has known the plaintiff his entire life.[141] He said that he spent "no time at all" with the plaintiff.[142] In response to a question about what the plaintiff did all day, Robert McCrady repeated that he doesn't see his brother often but if he "had to say[,] he drinks."[143] He stated that the plaintiff used to be "socially active in sports and maintained a relationship" before his conditions.[144] According to his brother, the plaintiff did not sleep often and had frequent nightmares.[145] Robert McCrady wrote that his brother does not take personal care

---

[136] AR 63.

[137] AR 76.

[138] AR 78.

[139] AR 81.

[140] AR 222.

[141] Id.

[142] Id.

[143] Id.

[144] AR 223.

[145] Id.

of himself.[146] He can feed himself and use the toilet without assistance.[147] He needed someone to take him to pick up medicine and to remind him to take it.[148]

According to Robert McCrady, the plaintiff did not prepare food or meals or do house chores because he had "no interest or energy."[149] He was able to pay bills, count change, handle a savings account, and use a checkbook and money orders.[150] He went outside daily, and shopped in stores for beer, cigarettes, and food.[151] The plaintiff enjoyed riding his bike and would go out places "when made to."[152] He tended to stay away from family, friends, neighbors, or others, but was "coming around more" due to his mother's illness.[153] "He does not like or trust people."[154] Since his condition began, he had been "anti social [sic] and depressed."[155]

### 2.2.2    Mental Health Advocates — Examining

On October 13, 2013, Jeffrey Davis, supervised by LCSW Katrina Steer, performed an employment assessment on Mr. McCrady at Mental Health Care Advocates in Berkeley, California.[156] He described Mr. McCrady as "somewhat apathetic" but said that he was "more open and talkative near the end of the interview."[157] Mr. McCrady provided background information about his life and his struggles with depression.[158] In his assessment, Mr. Davis wrote that Mr. McCrady was "able to find employment but quickly loses interest and walks away."[159] He

---

[146] *Id.*

[147] *Id.*

[148] AR 224.

[149] AR 224–25.

[150] AR 225.

[151] *Id.*

[152] AR 226.

[153] AR 227.

[154] *Id.*

[155] *Id.*

[156] AR 500–06.

[157] AR 501.

[158] AR 500–02.

[159] AR 502.

noted that Mr. McCrady "could benefit from a more thorough psychological evaluation and consideration of resumption of medication."[160]

### 2.3 Hearing Testimony

On June 20, 2016, the ALJ held a hearing.[161] At the hearing, Mr. McCrady was represented by attorney Amy Orgain from the Homeless Action Center.[162] The ALJ first asked Mr. McCrady questions about his daily life. Mr. McCrady testified that he was "currently displaced" and that he got around on his bicycle.[163] When asked by the ALJ what medicine he took, he responded, "Prozac and Risperdal and something else. I don't know what the other one is."[164] The ALJ asked Mr. McCrady if he still recycled (to make money), and Mr. McCrady answered that he hadn't recycled "in a while."[165] He said that he didn't "have the best trust relations with people" and that he [was] usually just "around his dog."[166]

Mr. McCrady's attorney then questioned him. She asked him to describe symptoms of his depression to which he responded, "I mostly just like to be by myself. I don't — I don't really trust people. My interactions are with my dog mostly and family. My days are — I don't know. . . Some days I don't like to go outside, I don't feel like putting on clothes, I don't feel like bathing, whatever. I don't want to listen to music. I have no energy sometimes."[167] He continued, "[t]hen there's other times where I have mood swings. I can be laughing, playing, and then I'll just be angry for no reason. Sometimes I just — I don't understand but I don't always like myself."[168] Counsel asked whether Mr. McCrady thought the medicine that he took helped with his

---

[160] AR 502.

[161] AR 38.

[162] AR 41.

[163] AR 43.

[164] Id.

[165] AR 44.

[166] Id.

[167] AR 44–45.

[168] AR 45.

symptoms.[169] He responded that he didn't really know what the medicine did but that he said one helped him sleep at night.[170] His doctor told him that he "can't really say which medicine is going to be the right medicine. It's like some guinea pig stuff. . . ."[171] He testified that while he was incarcerated, his depression felt like "a dark cloud."[172] Counsel asked whether there was anything else about his symptoms that he would like to tell the judge, and he said that "sometimes things seem like they just aren't going to get any better" and that he felt that cutting himself was a release.[173]

Mr. McCrady's attorney then asked him about his day-to-day activities. He testified that he got food for himself at the store "all day every day" because his medicine made him hungry.[174] He did not give a discernible answer when asked whether he did chores.[175] He said that he washed his own laundry "about once a month."[176] He did not see his family very often, but he talked to his dad by text or on the phone every day.[177] He talked to his two brothers "from time to time."[178] He had not spoken to his sister since his mother died, but he would like to reestablish a relationship with her.[179]

His attorney asked Mr. McCrady whether he had difficulty concentrating and focusing, and he said "Yea, I guess," and that he forgot "a lot of stuff."[180] She asked a number of questions about his drug and alcohol use. He testified that he had not used drugs in years and that within the two or

---

[169] *Id.*

[170] *Id.*

[171] AR 45–46.

[172] AR 48.

[173] AR 49.

[174] AR 46.

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] AR 46–47.

[179] AR 46.

[180] AR 47.

three months before to the hearing he stopped drinking.[181] He said he never considered himself an alcoholic but was a "recovered drug addict."[182] He testified that he had been "drinking since [he] was born."[183] He claimed that he had problems with his stomach when he was born and could not drink milk, so the doctor prescribed beer.[184] Ms. Orgain asked about his drinking before he stopped, and he said that he drank practically every day but he "didn't have a problem — it wasn't a problem."[185] He went to a treatment program for substance abuse and drinks because he "like[d] to enjoy the buzz of beer" but that it was not his "lifeline."[186]

A VE was on speakerphone during the hearing but was not asked any questions.[187]

### 2.4   Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. McCrady was disabled and concluded that he was not.[188]

At step one, the ALJ found that Mr. McCrady had not engaged in substantial gainful activity since the application date (June 25, 2013).[189]

At step two, the ALJ found that Mr. McCrady had the following severe affective disorder, anxiety disorder, and substance abuse disorder.[190] The ALJ also found that those disorders caused "more than minimal functional limitations with respect to the [plaintiff's] ability to perform basic work activities.[191]

---

[181] AR 47.

[182] *Id.*

[183] *Id.*

[184] AR 48.

[185] *Id.*

[186] *Id.*

[187] AR 41; *see* AR 40–50.

[188] AR 24–32.

[189] AR 26.

[190] *Id.*

[191] *Id.*

At step three, the ALJ found that none of Mr. McCrady's impairments, alone or in combination, met or medically equaled the severity of a listed impairment.[192] The ALJ considered whether the paragraph B criteria of any listing were satisfied. To satisfy paragraph B, the "mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated epoxides of decompensation, each of an extended duration."[193] The ALJ found that Mr. McCrady had "mild restriction in activities of daily living, mild to moderate difficulties in social functioning, and mild to moderate difficulties in concentration, persistence, or pace, with no episodes of decompensation of extended duration" and thus did not satisfy the paragraph B criteria for any listing.[194]

The ALJ also determined that Mr. McCrady did not meet the paragraph C criteria for any listing because he did "not have a medically documented history of a chronic affective disorder of at least 2 years' duration [] that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and "does not have a complete inability to function independently outside the area of the home."[195]

Step four was not at issue in this case, because Mr. McCrady did not have past relevant work for the ALJ to consider.[196]

At step five, the ALJ found that considering Mr. McCrady's age, education, work experience, and residual functional capacity, there were jobs that existed in the national economy that he could perform.[197] The ALJ determined that Mr. McCrady had "the residual functional capacity to perform a full range of work at all exertional levels and that he [would be] able to perform simple

---

[192] *Id.*

[193] *Id.*

[194] AR 27.

[195] *Id.*

[196] AR 31.

[197] *Id.*

routine tasks equating to unskilled work with occasional contact with coworkers or the public."[198] The ALJ based this determination on his finding that while Mr. McCrady's medically determinable impairments could reasonably be expected to cause his reported symptoms,[199] "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not found consistent with the medical evidence and other evidence in the record . . . ."[200] The ALJ noted that findings on clinical examination had been "generally within normal limits" and that Mr. McCrady stated that his conditions were "'manageable with medication' when he took them."[201] Additionally, the ALJ noted that Mr. McCrady reported that "many of his mood problems were 'situational,' suggesting transient symptoms and further supporting the finding that a more restrictive residual functional capacity is not warranted for any twelve-month period."[202] He indicated that Mr. McCrady's poor work history suggested that "his current unemployment might be attributable to reasons other than functional limitations arising from his impairments."[203]

In so finding, the ALJ relied heavily on the report of psychological consultative examiner Kyle Van Gaasbeek, Psy.D., who assigned Mr. McCrady a GAF score of 55, indicating "moderate symptoms of impairment."[204] The ALJ found Dr. Van Gaasbeek's opinion to be consistent with the record as a whole.[205] Conversely, he afforded Dr. Catlin's GAF score of 45, "indicating serious

---

[198] AR 27.

[199] Mr. McCrady's reported symptoms included "mood swings, poor sleep, nightmares, neglecting personal care, anhedonia, low energy, needing reminders to take medications, inability to cook because he has '[b]urned up the stove,' not doing household chores because of lack of interest or energy, racing thoughts, a history of self-harm, fear of people, distrust and dislike of others, discomfort in crowds, social isolation, paranoia, hypervigilance, intrusive memories and ruminating thoughts of past trauma, easily startling at loud noises, uncontrollable temper, violent episodes, getting along poorly with authority figures, difficulty adjusting to life outside prison, having an imaginary friend, and auditory hallucinations" and "difficulty concentrating, paying attention for longer than five to 10 minutes, following written or spoken instructions, handling stress or changes in routine, and getting along with others." AR 28.

[200] AR 28.

[201] AR 29.

[202] *Id.*

[203] AR 30.

[204] *Id.*

[205] *Id.*

symptoms or impairment," little weight, "in light of the weight of the evidence now of record, including findings on mental status examinations and other opinion evidence."[206] The ALJ similarly weighed the form completed by Nurse Practitioner Loeb, finding it to be "unsupported by the clinical signs and findings and contradicted by the weight of the evidence."[207] He found that the assessments of Ms. Childs and Dr. Franklin were "consistent to the record only to the extent consistent with [the ALJ's] finding."[208] The ALJ did not give significant weight to Robert McCrady's report, finding that it was "essentially a reiteration of the claimant's subjective allegations."[209]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a while." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

---

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] *Id.*

**GOVERNING LAW**

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

Mr. McCrady contends that the ALJ erred by:

    (1) incorrectly weighing the medical opinion evidence;

    (2) finding that Mr. McCrady's condition does not meet or equal a listing;

    (3) assessing Mr. McCrady's residual functional capacity; and

    (4) determining that Mr. McCrady was able to perform other work.[210]

Mr. McCrady seeks remand for payment of benefits or, in the alternative, further proceedings.[211]

### 1. Whether the ALJ Erred By Weighing Medical-Opinion Evidence

Mr. McCrady contends that the ALJ erred by failing to provide legally sufficient reasons for discounting the opinions of Dr. Catlin, Dr. Franklin, and Nurse Practitioner Loeb.[212] The court remands because the ALJ did not give specific and legitimate reasons for rejecting the opinions of Drs. Catlin and Franklin and did not provide germane reasons for rejecting Nurse Practitioner Loeb's.

The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2015) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). In weighing and evaluating the evidence, the ALJ

---

[210] Motion – ECF No. 16 at 4.

[211] *Id.* at 17.

[212] *Id.* at 4.

must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal punctuation and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of accepted medical sources: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non–examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted).

The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining

why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." 20 C.F.R. § 414.1513(a). The ALJ is required to consider observations by "other sources" as to how an impairment affects a claimant's ability to work, *id.*; nonetheless an "ALJ may discount the testimony" or an opinion "from these other sources if the ALJ gives . . . germane [reasons] for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted). An opinion from "a medical source who is not an acceptable medical source may outweigh the medical opinion of an acceptable medical source." 20 C.F.R. § 404.1527(f)(1). "For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." *Id.*

### 1.1 Dr. Catlin and Dr. Franklin

Dr. Catlin — an examining physician — performed a psychological-disability evaluation on Mr. McCrady on October 22, 2013.[213] Dr. Franklin — also an examining physician — supervised a psychological evaluation of Mr. McCrady on April 14, 2016 and certified the resulting report filed on May 13, 2016.[214] The opinions of both Dr. Catlin and Dr. Franklin are contradicted by Dr. Van Gaasbeek's opinion and the DDEs.[215] Thus, to discount these opinions, the ALJ was required to give "specific and legitimate reasons supported by substantial evidence in the record." *Reddick*, 157 F.3d at, 725 (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.").

Regarding Dr. Catlin's opinion, the ALJ wrote, "[t]his opinion is given little weight, in light of the evidence now of record, including findings on mental status examinations and other opinion evidence, as well as other relevant factors including activities, as discussed herein."[216] As to Dr. Franklin's opinion (completed by Ms. Childs under Dr. Franklin's supervision), the ALJ wrote that the findings were "consistent with the record only to the extent consistent with this finding for the same reasons discussed."[217] Such conclusory statements do not qualify as "specific and legitimate reasons" within the meaning of *Garrison*. *See* 759 F.3d at 1012; *McConner v. Halter*, 15 F. App'x 399 (9th Cir. 2000).

The ALJ's reference to the opinions being inconsistent with Mr. McCrady's "activities," without further explanation, also does not constitute a "specific and legitimate" reason to give them less weight. *Garrison*, 759 F.3d at 1012. While a claimant's daily activities may provide a specific and legitimate basis for a finding of inconsistency with his disabling conditions, *see*

---

[213] AR 332.

[214] AR 518.

[215] *Compare* AR 332–339 and AR 518–523 *with* AR 492–495, AR 50–64 and AR 65–82.

[216] AR 30.

[217] *Id.*

*Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012); *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991), the Ninth Circuit has recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. *Garrison*, 759 F.3d at 1016. In *Garrison ,* the court found that "only if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these [daily] activities have any bearing on her credibility." *Id.* (alterations in original) (internal quotations omitted); *see also Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."); *Reddick ,*157 F.3d at 722 ("disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.")

Here, the "activities" that the ALJ discusses in his opinion, namely that Mr. McCrady was able to "obtain free meals, ride his bicycle 'everywhere,' recycle to earn money, go out alone, go places when picked up by someone, and shop for necessities"[218] are basic requirements of daily living, particularly if one is homeless. The ALJ failed to engage in the necessary specific analysis of the inconsistencies between the severity of Mr. McCrady's reported limitations and his daily activities to enable appropriate review. In particular, the ALJ failed to discuss how Mr. McCrady's alleged mental limitations were inconsistent with his reported daily activities.

### 1.2    Nurse Practitioner Skyler Loeb

As a nurse practitioner, Ms. Loeb qualifies as an "non-acceptable" medical source. 20 C.F.R. § 414.1513(a). As such, the ALJ was required to give "germane" reasons for discounting her testimony. The ALJ's stated reason for giving little weight to Ms. Loeb's opinion was that it was "unsupported by the clinical signs and findings and contradicted by the weight of the evidence."[219]

---

[218] *Id.*

[219] *Id.*

First, in the Ninth Circuit, "contradictory medical evidence is not a germane reason to reject lay witness testimony." *Burns v. Berryhill,* 731 F. App'x 609, 613 (9th Cir. 2018) (citing *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017)).

Second, Mr. McCrady's argument that Ms. Loeb's opinion should be given additional weight based on her history with Mr. McCrady has merit. As discussed above, a non-acceptable medical source's opinion can outweigh that of an acceptable medical source where the non-acceptable medical source has seen an individual more than once. *See* 20 C.F.R. §404.1527(f)(1). Here, Mr. McCrady attended at least five sessions with Ms. Loeb at LifeLong Medical Care. [220] Ms. Loeb had significantly more experience with Mr. McCrady than any other medical source in the record. As outlined above, Ms. Loeb found Mr. McCrady to have "Extreme" limitations in four out of thirteen functions related to work and "Marked" limitations in an additional four. [221] Notably, Ms. Loeb indicated that Mr. McCrady had an "Extreme" limitation in his ability to "perform at a consistent pace." [222] Given the generality of the reasons proffered by the ALJ, the court cannot properly assess whether they are germane and thus remands for reconsideration of this issue.

### 2. Whether the ALJ Erred By Finding that Mr. McCrady's Condition Does Not Meet or Equal a Listing

At step three, the ALJ evaluated Mr. McCrady under two listed impairments: 12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). 20 C.F.R. pt. 4, subpt. P, app'x 1. To meet the paragraph B criteria for listings 12.04 and 12.06, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself." *Id*. In order to meet the C criteria for listings 12.04 and 12.06, a claimant must have a "mental disorder . . . [that] is 'serious and persistent' . . ." and that there must be "evidence

---

[220] AR 535–49.

[221] AR 529–30.

[222] AR 530.

of both (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *Id.*

The claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria of a listing. *Tackett,* 180 F.3d at 1100. "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). Generally, a "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listing." *Id; see also,* e.g., *Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir. 1990) (noting that ALJ's unexplained finding at step three was reversible error), unless the ALJ's discussion of the relevant medical evidence adequately supports the conclusion. *Lewis*, 236 F.3d at 513.

Here, the ALJ concluded that Mr. McCrady's impairments did not meet the paragraph B or C criteria for either listing because he had "mild restriction in activities of daily living, mild to moderate difficulties in social functioning, and mild to moderate difficulties in concentration, persistence or pace, with no episodes of decompensation of extended duration. . . ."[223] The ALJ did not discuss specifically what evidence he relied upon in making this determination. Without more, the court cannot find that there was sufficient evidence underlying the ALJ's determination that Mr. McCrady's impairments met the paragraph B or C criteria for listing 12.04 and/or 12.06. Therefore, the court remands on this issue.

### 3. Whether the ALJ Erred by Assessing the Residual Functional Capacity ("RFC")

The ALJ found that Mr. McCrady had an RFC that allowed him to "perform a full range of work at all exertional levels and [found] that he is able to perform simple routine tasks equating to unskilled work with occasional contact with coworkers or the public."[224] As discussed above, the

---

[223] AR 27.

[224] *Id.*

ALJ did not provide adequate reasons for discounting certain medical testimony. Because the court remands for a reweighing of medical-opinion evidence and the RFC assessment is built on the ALJ's assessment at the prior steps in the sequential-evaluation process, the court remands here too.

### 4. Whether the ALJ Erred by Determining that Mr. McCrady Was Able to Perform Other Work

At step five, the burden shifts to the ALJ to determine whether the claimant can "make an adjustment to other work." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520). If the ALJ finds that the claimant can adjust to other work, he must then establish that "there are a significant number of jobs in the national economy that the claimant can do." *Id.* This can be established by either referring to the Medical-Vocational guidelines (the "Grids") in 20 C.F.R., part 404, subpart P, appendix 2, or by taking testimony from a vocational expert. *Id.*

Here, the ALJ relied solely on the Grids in making his assessment. Whether or not this was proper depends on whether the Grids "accurately and completely describe the claimant's abilities and limitations." *Reddick*, 157 F.3d at 729 (citing *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985)). Whether this is true in this case, in turn, depends on the ALJ's determination of Mr. McCrady's abilities and limitations, which may or may not differ after reconsideration of the medical-opinion testimony. The court remands this issue for reconsideration too.

### CONCLUSION

The court grants Mr. McCrady's summary-judgment motion, denies the Commissioner's cross-motion, and remands the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: November 1, 2018

_____
LAUREL BEELER
United States Magistrate Judge